

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-23-00101-CV |
| | § | Appeal from the |
| IN THE INTEREST OF A.H., A CHILD | § | 65th Judicial District Court |
| | § | of El Paso County, Texas |
| | § | (TC# 2021DCM2369) |

## MEMORANDUM OPINION

Appellant S.T. [1] appeals the trial court's judgment terminating her parental rights and appointing Appellee Texas Department of Family and Protective Services (DFPS) permanent managing conservator of her child, A.H., based on three statutory predicates and the child's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), and (P) and 161.001(b)(2). In five issues on appeal, S.T. challenges the legal and factual sufficiency of the evidence to support the trial court's findings on each predicate ground, best interest, and the conservatorship appointment. For the following reasons, we affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

---

[1] To protect the privacy of the parties, we refer to them by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(a), (b)(2).

Before A.H.'s birth, S.T. had an open case involving six of her children. In the prior case, the eldest child, J.P., exited extended care and the four middle children were placed with paternal relatives. The youngest child, Y.T., was on a monitored return to S.T. while A.H.'s case started.

In April 2021, DFPS responded to allegations that S.T. was using drugs and leaving A.H. with her adult daughter—N.T.—who was also using drugs. A.H. was removed from the home. DFPS then filed its original petition alleging S.T. knowingly placed or allowed A.H. to remain in an endangering environment or engaged in endangering conduct. The next day, the trial court named DFPS A.H.'s temporary managing conservator.

Following this removal, S.T. engaged in the required services and followed DFPS's family service plan. On March 23, 2022, A.H. was returned to S.T.'s custody on a monitored return. In mid-July 2022, A.H. was re-removed due to S.T.'s relapse on methamphetamine. At the final hearing, which took place on December 9, 2022, and March 7, 2023, DFPS sought to terminate S.T.'s parental rights. A.H.'s attorney ad litem agreed S.T.'s parental rights should be terminated. At the time of the final hearing, A.H. was two years old. Following the final hearing, the trial court terminated S.T.'s parental rights to A.H. and appointed DFPS A.H.'s permanent managing conservator, finding termination was in A.H.'s best interest, and that S.T. violated three statutory predicate grounds involving creating an endangering environment, engaging in endangering conduct, and using a controlled substance after completing a court-ordered substance abuse treatment program. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(2) and 161.001(b)(1)(D), (E), and (P). This appeal followed.

Key witness testimony is summarized below.

**A. Mom's testimony**

In her testimony, S.T. discussed her history of substance abuse and prior DFPS involvement. She started using methamphetamine when she was 17 years old. She was 42 years old at the time of trial. On the last day of the final hearing, which took place more than seven months after A.H.'s re-removal, S.T. testified that she had stopped using methamphetamine toward the end of July 2022 or beginning of August 2022—shortly after A.H. was re-removed—and had been sober for over 200 days. As to her previous case involving her other children, including Y.T., S.T. testified she had completed the required services in that case, including substance abuse counseling through Aliviane.

When A.H. was first removed, she and S.T. were living with Y.T. and N.T. While S.T. worked 12-hour shifts at the convenience store, N.T. cared for A.H. and Y.T. During this time, S.T. started to believe N.T. was using drugs. She confronted N.T. regarding the substance abuse, but N.T. denied using drugs. Unconvinced, S.T. placed drugs in the home—where A.H. was living—to test N.T.'s reaction. S.T. explained her actions as follows:

Q.   And what was the purpose of putting those drugs in the house?

A.   Because I wanted to honestly find out what was going on with my daughter [N.T.], and so see how her reaction was. And her reaction was what I thought. She got really mad, she did not want to admit to her drug use, she started hitting me. I backed away; I went to go get my son and I told her, take those narcotics away from my daughter and throw them away.

My daughter did not. And I know it sounds weird, but when you have two children that need you and you have one that is really hooked on something and you want the best for them, you're going go to any extremes to find out what's wrong.

And through this, my daughter went to in – outpatient – or inpatient, got the help that she needed, and she does have her kids. So I don't regret that decision at all, because at the end of the day my daughter has her children with her.

3

S.T. further testified that during this time, she relapsed in her drug use due to stress. Because of S.T.'s relapse, both children were removed—A.H. for the first time and Y.T. for a second time. After this removal, S.T. complied with the required services, just as she had when Y.T. was first removed before A.H.'s birth. As part of the required services following A.H.'s first removal, S.T. completed Aliviane outpatient substance abuse treatment for a second time.

When A.H. was placed back in S.T.'s custody on a monitored return, S.T. relapsed again.[2] Although she wanted to remain sober, her work hours and inability to be home with A.H. and Y.T. were causing additional stress. After the second removal, S.T. entered inpatient treatment at Aliviane.

After completing inpatient treatment, S.T. entered long-term recovery. According to S.T., long-term recovery involves prioritizing sobriety and creating support systems in the real world. To facilitate her long-term recovery, S.T. and J.P., her 21-year-old son, began living with her mother. S.T. also voluntarily entered a drug court program. In drug court, S.T. had to call in daily, check in weekly, and see the judge monthly. She was required to submit to drug tests and participate in counseling. The drug court program is between 12 and 18 months with up to five years of after care. S.T also entered outpatient treatment where she takes six hours of classes and one individual counseling session a week.

S.T. told the trial court she was fully committed to sobriety and ready to take custody of A.H. S.T. testified that she was tired of the cycle of chaos and committed to sobriety for herself, not anyone else. She understood her drug addiction and the need to ask for support. S.T.'s support system included Aliviane, drug court, her family, and her counselor. S.T. also believed she could access day care through Aliviane or DFPS. Further, J.P. agreed to watch A.H. when S.T. worked.

---

[2] According to the clerk's record, A.H. was removed from the monitored return on July 13, 2022.

4

S.T. did not believe her parental rights should be terminated because she had asked for help, placed herself in programs, and created a support system. S.T. admitted addiction recovery is a life-long process and she may relapse. S.T. told the court that even if she were to relapse, she was committed to asking for help and pursuing sobriety again. S.T. believed it was in A.H.'s best interest to return to her care.

B.      **Testimony from the conservatorship worker for S.T.'s prior case**

Martha Saenz was the assigned conservatorship worker in S.T.'s prior case, which involved A.H.'s older six siblings. In 2020, the prior DFPS began due to concerns about S.T.'s mental health, potential substance abuse, and physical neglect allegations. As part of that case, S.T. successfully completed parenting classes, domestic violence classes, a psychological evaluation, therapy, random drug testing, an OSAR evaluation, and recommended drug treatment. The oldest child, J.P., exited extended care. S.T. was appointed permanent possessive conservator over the four middle children, who were placed with paternal relatives in California. The youngest child, Y.T., was placed with S.T. on a monitored return in December 2020. During Y.T.'s monitored return, S.T. lived with A.H., Y.T., and the family of her adult daughter, N.T.

In April 2021, DFPS had concerns about substance abuse, S.T.'s mental health, and an incident of family violence between S.T. and N.T. DFPS removed Y.T. from the home. After the removal, S.T. was asked to complete the previously required courses again. The OSAR assessment recommended outpatient treatment. In December 2021, the case was reassigned. Before the reassignment, S.T. was engaging in her required classes.

Although Saenz was not assigned to A.H., she observed that A.H. was up to date on her doctor's appointments, meeting her milestones, and appeared fine. However, Saenz testified she

was concerned about leaving A.H. in the home after removing Y.T. due to S.T.'s mental health, substance abuse, and the domestic violence incident.

### C. Testimony from the supervising investigator in the 2021 removal

Lizette Gutierrez supervised the investigator assigned to A.H.'s case. According to Gutierrez, the intake for neglectful supervision for A.H. and Y.T. was received on April 20, 2021. One of the allegations was that S.T. was placing the children in N.T.'s care while N.T. was using methamphetamine and amphetamines. The second allegation was that a "pretty severe physical altercation" between S.T. and N.T. had occurred the day before.

During the investigation, Gutierrez was in contact with the assigned investigator over the phone. The investigator attempted a drug test on scene, but the test was not completed because S.T. did not produce enough saliva. Gutierrez reported A.H. appeared physically okay when the investigator arrived.

Because Y.T. was on a monitored return but A.H. was not, Y.T. was removed from the home first. DFPS attempted to prevent A.H.'s removal by contacting her father, M.H. But M.H. was unable to take custody of A.H. and did not provide contact information for paternal relatives who could care for A.H. DFPS was unable to identify any other relatives who could care for A.H. Further, DFPS offered to place A.H. at the Child Crisis Center temporarily, but S.T. refused. Ultimately, A.H. was removed.

### D. Testimony from the investigator in the 2022 removal

Beatrice Rodriguez was assigned as an investigator in Y.T.'s case. On July 13, 2022, Rodriguez received a report that S.T. was under the influence of drugs while A.H. and Y.T. were on monitored returns in their respective cases. As part of her investigation, Rodriguez went to S.T.'s home. S.T. was paranoid and asked Rodriguez to leave.

After Rodriguez left the home, she went to S.T.'s mother's house. There, J.P. was caring for A.H. and Y.T. Unable to find someone to care for the children, Rodriguez removed both children. Rodriguez testified that the children were in immediate danger based on S.T.'s demeanor and inability to provide anyone to take custody of the children.

### E.  Testimony from A.H.'s conservatorship worker

Melissa Martinez was the conservatorship worker assigned to A.H.'s case. As part of this case, S.T. was required to: undergo a psychological assessment and follow the recommendations; undergo a substance abuse assessment and follow the recommendations; undergo a psychiatric assessment and follow through with mental health services; take parenting and domestic violence classes; engage in individual counseling; maintain housing stability; participate in consistent supervised visitation; and undergo drug testing. At that time, OSAR recommended outpatient treatment. In March 2022, S.T. was compliant with her required services. Therefore, A.H. was placed back in S.T.'s custody on a monitored return.

In July 2022, S.T. relapsed on methamphetamines, and A.H. was again removed. Following her relapse and the second removal, S.T. voluntarily entered inpatient substance abuse treatment through Aliviane. Through the inpatient treatment program, S.T. participated in parenting classes, individual counseling, and mental health treatment. In December 2022, S.T. completed inpatient and began outpatient treatment. S.T. had missed approximately six outpatient sessions at the time of the final hearing. Additionally, S.T. voluntarily participated in family intervention drug court, where she submitted to regular drug tests and did not have any positive drug tests between January 2023 and the last day of the final hearing.

S.T. also made changes in other areas of her life. She moved in with her mother and started a new job. While S.T. missed roughly half of her visits with A.H. in January 2023, her visits had

since become more consistent. During these visits, S.T. met A.H.'s needs, and the two had positive interactions.

Martinez also testified about A.H.'s then-current placement. A.H. was approximately two years and nine months old at the time of the trial. She and Y.T. were living in a foster home where A.H. had bonded with their foster mother. By that time, A.H. had lived with this foster family for three months. The foster parents were meeting her physical needs. They also had access to early childhood intervention services and the early Headstart program. Martinez testified the foster parents had positive interactions with A.H. If parental rights were terminated, DFPS planned for A.H. to be adopted by her current foster family.

Martinez also testified regarding her concerns if S.T. and A.H. were reunified. According to Martinez, S.T. had a pattern of completing services when her children were in DFPS custody but failing to continue and maintain stability when they were returned. In the past, S.T. relapsed when children were returned to her care. In Martinez's opinion, S.T.'s history repeatedly exposed A.H. to harmful behavior. S.T. had not, in Martinez's opinion, learned from the services that DFPS had provided. Therefore, DFPS requested that the trial court terminate S.T.'s parental rights.

### F. CASA recommendation

The court-appointed special advocate (CASA) recommended termination of S.T.'s parental rights because she did not "think it's fair for a two-year-old who, you know, is barely learning to talk, to standby and wait for the possibility that her mom becomes sober for her lifetime[.]" In her recommendation, the CASA referred to S.T.'s pattern of completing required services then returning to prior course of conduct. If A.H. was returned to S.T., the CASA believed a strong possibility existed that A.H. would return to DFPS care.

### G. Trial court's judgment

At the close of the final hearing, the trial court terminated S.T.'s parental rights to A.H.[3] The trial court found clear and convincing evidence supported the termination based on Texas Family Code § 161.001(b)(1)(D), (E), and (P). The trial court also found termination was in A.H.'s best interest. DFPS was named A.H.'s permanent managing conservator.

## STANDARD OF REVIEW AND APPLICABLE LAW

In five issues, S.T. challenges the legal and factual sufficiency of the evidence to support each of the predicate termination grounds, best interest, and the DFPS's permanent managing conservatorship appointment.

### A. Standard of review

A court of appeals reviewing a legal-sufficiency challenge to a parental termination "must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). The reviewing court must consider all evidence in the light most favorable to the finding and "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* at 266. While any evidence contrary to the findings should be disregarded if a reasonable fact finder could have disbelieved it, a reviewing court should not disregard contrary undisputed facts. *Id.*

A court of appeals reviewing a factual-sufficiency challenge to a parental termination must uphold the termination findings "if the evidence is such that a reasonable jury could form a firm belief or conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a)." *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). The reviewing court must consider

---

[3] The trial court also terminated the parental rights of A.H.'s father. He did not appeal.

all evidence the fact finder could reasonably have found to be clear and convincing. *Interest of K.A.C.*, 594 S.W.3d 364, 372 (Tex. App.—El Paso 2019, no pet.). When reviewing disputed evidence, an appellate court must consider whether a reasonable fact finder could not have resolved the dispute in favor of its findings. *Id.* If a fact finder could not have resolved the disputed evidence in favor of its findings and such evidence is so significant that she could not reasonably have formed a firm belief or conviction without it, then the evidence is factually insufficient. *Id.*

### B. Parental termination

While the natural rights of a parent to her child are of a constitutional magnitude, they are not absolute. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A court may terminate parental rights if it finds, by clear and convincing evidence, that the parent has committed one or more of the acts specifically set out in § 161.001(b)(1) of the Texas Family Code and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(A)-(U), (b)(2); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it is of "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "[T]he reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'" *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d at 26).

During the pendency of a case, a trial court may order a monitored return where DFPS returns the child to the parent while continuing to serve as a temporary managing conservator. TEX. FAM. CODE ANN § 263.403. During a monitored return, the trial court retains jurisdiction over the case. *Id.*; *In Interest of D.O.A.I.*, Nos. 11-16-00141, 142, & 143-CV, 2016 WL 6998940, at *2 (Tex. App.—Eastland Nov. 30, 2016, no pet.) (mem. op.). Therefore, when a parental termination

follows a monitored return, the trial court may consider evidence from the entire pendency of the termination proceeding. *See J.C.C. v. Tex. Dep't Fam. & Protective Servs.*, No. 03-13-00845-CV, 2014 WL 2740373, at *4 (Tex. App.—Austin June 13, 2014, no pet.) (mem. op.) ("we hold that it was proper for the jury to hear and consider evidence related to the children's best interest that arose before the [] monitored return"); *see, e.g., In Interest of A.N.M.*, Nos. 10-17-00079 & 81-CV, 2017 WL 3298960, at *6–8 (Tex. App.—Waco Aug. 2, 2017, no pet.) (mem. op.) (considering evidence from the entire pendency of a parental termination case that involved a monitored return).

In addition to the best-interest ground, a single statutory predicate ground is sufficient to uphold the termination of parental rights. *Interest of N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). However, because findings under subsections (D) and (E) may affect a person's parental rights to her other children, an appellate court must always review the sufficiency of evidence under both of those findings. *Id.*

## ANALYSIS

In five issues, S.T. challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings on subsections (D), (E), and (P), to support the trial court's best interest finding, and to support the trial court's appointment of DFPS as permanent managing conservator. We address each issue, except the subsection (P) ground, in turn.

### A. Subsection (D): endangering environment

In her first issue, S.T. challenges the legal and factual sufficiency of the evidence to support the trial court's finding under subsection (D). To terminate parental rights under subsection (D), a fact finder must find by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D); *Doyle v. Tex.*

11

*Dep't of Protective & Regulatory Services*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). Endangerment means "to expose to loss or injury or to jeopardize a child's emotional or physical health." *Doyle*, 16 S.W.3d at 394. While endangerment is more than the threat of possible ill effects of a not ideal family environment or metaphysical injury, the endangering conduct or conditions need not be directed at the child. *Id.* Nor must the child suffer an actual injury. *Id.*

Subsection (D) focuses on the child's environment before removal. *Interest of I.D.G.*, 579 S.W.3d 842, 850 (Tex. App.—El Paso 2019, pet. denied); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A child's environment includes both the suitability of the child's living conditions and the conduct of parents and other persons who are regularly within the child's home. *M.V. v. Tex. Dep't & Fam. Protective Servs.*, 446 S.W.3d 879, 889 (Tex. App.—El Paso 2014, no pet.). Illegal drug use by the parent or other residents of the child's home may support an endangerment finding under subsection (D). *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.).

In this case, S.T. had a significant history of substance abuse involving methamphetamines, including during this case. S.T. started using methamphetamines well over 20 years ago, when she was 17. Specific to this case, S.T. had relapsed when A.H. was first removed in April of 2021. She relapsed again due to stress not long after A.H. was reunified with her in a monitored return.

Further, S.T. had placed A.H. in an environment with N.T., whom she suspected of using drugs. Despite her suspicions, S.T. continued to rely on N.T. for childcare. Additionally, S.T. personally placed drugs in the home where A.H. lived to test N.T.

An endangering environment may also be produced by a parent or other resident's violent conduct. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (citing *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ)). Here, Gutierrez testified

DFPS was investigating an allegation that a "pretty severe physical altercation" between S.T. and N.T. had occurred the day before A.H. was first removed. In her testimony, S.T. admitted N.T. had hit her when confronted about alleged drug use.

Looking at the evidence in the light most favorable to the finding, the trial court could reasonably have formed a firm belief or conviction that S.T. knowingly placed A.H. or knowingly allowed A.H. to remain in conditions or surroundings which endangered her physical or emotional well-being. Accordingly, we overrule S.T.'s first issue.

### B. Subsection (E): endangering conduct

In her second issue, S.T. challenges the legal and factual sufficiency of the evidence supporting the trial court's finding under subsection (E). Under subsection (E), to terminate parental rights, a fact finder must find by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical and emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Endangerment under subsection (E) is defined the same way as endangerment is defined under subsection (D). *See Doyle*, 16 S.W.3d at 394.

When considering the sufficiency of the evidence to terminate under subsection (E), the fact finder must determine whether the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct. *Interest of K.A.C.*, 594 S.W.3d at 372–73. The statute requires a voluntary, deliberate, or conscious course of endangering conduct by the parent. *Id.* A fact finder may consider evidence of the parent's actions before and after the child was born and before and after the child was removed (or in this case, removed and re-removed). *Id.* Further, the parent's endangering conduct may occur outside of the child's presence. *Id.*

A parent's illegal drug use, including the effect of such use on her life and parenting abilities, may be establish an endangering course of conduct under subsection (E). *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Interest of K.A.C.*, 594 S.W.3d at 373; *In Interest of K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.); *see Walker v. Tex. Dep't of Family & Protective Services*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."). "Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct." *In re S.R.*, 452 S.W.3d at 361–62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Services*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)).

As mentioned above, S.T. had a significant history of substance abuse and relapsed twice while this case was pending. In addition to the relapses, which led to A.H.'s removal and re-removal, S.T. also admitted to using illegal drugs through the time shortly after A.H. was removed for the second time. Additionally and as discussed above, S.T. personally placed drugs in the home with A.H.

We recognize that S.T. has taken steps toward achieving a drug-free lifestyle. She voluntarily admitted herself to an inpatient program in August of 2022 after A.H.'s re-removal. After completing the inpatient program, S.T. entered outpatient treatment and drug court. S.T. testified that she is committed to her sobriety and long-term recovery. A parent's recent improvement, however, does not counteract a long history of drug use and endangering conduct. *In re J.O.A.*, 283 S.W.3d at 346.

In *J.O.A.*, the parent admitted to daily marijuana drug use before the youngest children were born and a history of domestic violence. *Id.* During the pendency of the case, the parent was incarcerated for domestic violence. *Id.* After his release from jail, the parent attended a substance abuse program, attended classes, became more consistent in his visitation, and significantly improved his parenting. *Id.* The Texas Supreme Court held "[w]hile the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *Id.*

Like the parent in *J.O.A.*, S.T. has a long history of drug use and irresponsible choices. Before her inpatient program in the latter part of 2022, S.T. had completed multiple rounds of outpatient substance abuse treatment over time. S.T. had also completed the classes and treatment required in her prior case. Unfortunately, even after the positive interventions, S.T. continued to relapse. And her stress, which S.T. testified was a factor in relapsing, understandably seemed to increase when she had children in her care and custody. Martinez testified to her concerns regarding S.T.'s pattern of decline upon receiving children back into her care:

> The concern is that [S.T.] tends to do well, complies with services while her children are out of her care. When her children are returned to her care, that is when she starts falling off on doing what she needs to do to maintain stability and she eventually relapses while the children are in her care.

S.T.'s recent improvement is significant. It does not, however, erase her prior course of conduct which endangered the physical and emotional well-being of A.H.

Looking at the evidence in the light most favorable to the finding, the trial court could reasonably have formed a firm belief or conviction that S.T. engaged in conduct or knowingly

placed A.H. with persons who engaged in conduct which endangered her physical and emotional well-being. Accordingly, we overrule S.T.'s second issue.

Having determined the trial court's predicate findings under subsections (D) and (E) are grounded in legally and factually sufficient evidence, we decline to address S.T.'s third issue relating to subsection (P), as it is unnecessary to the resolution of this appeal. TEX. R. APP. P. 47.1.

### C. Best interest of the child

In her fourth issue, S.T. challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding. To terminate parental rights, in addition to a termination ground, a court must find that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2); *Interest of G.C.S.*, 657 S.W.3d 114, 133 (Tex. App.—El Paso 2022, pet. denied). A strong but rebuttable presumption exists that it is in the child's best interest to preserve the parent-child relationship. *In Interest of B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). The child's best interest is analyzed under the *Holley* factors:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976) (internal citations omitted). "While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child." *In Interest of J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.)).

**(1) The child's desires**

"When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)).

By the time of the final hearing, A.H. had been living in a foster home with Y.T. for three months and had bonded with her foster family. Over those three months, the foster family consistently met A.H.'s physical needs and had positive interactions with her. Similarly, Martinez testified S.T.'s interactions with A.H. were good and she met A.H.'s needs during visits. Although she missed approximately half of the visits in January 2023, S.T.'s visits became more consistent in the weeks prior to the last day of trial.

Here, because A.H. has been consistently well-cared-for by her foster family for months and is bonded with her foster mother while S.T. only recently began to consistently visit with her, this best-interest factor weighs in favor of termination. *See In re S.R.*, 452 S.W.3d at 369-70 (determining that the best-interest factor pertaining to the child's desire weighed in favor of termination when the parent was unable to offer stability and the children were well-cared-for by their foster family). In the CASA's recommendation, she reported S.T. had a pattern of becoming consistent and compliant but then failing to maintain those changes. And A.H.'s attorney ad litem had similar concerns.

Therefore, this factor weighs in favor of the trial court's best-interest determination.

**(2) The emotional and physical needs of and danger to the child now and in the future; acts and omissions of the parent**

17

When reviewing the factual and legal sufficiency of a best-interest finding, a court may also consider the evidence supporting the predicate grounds for termination. *In Interest of L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (Tex. App.—Houston [14th Dist.]. "A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent." *Interest of O.E.R.*, 573 S.W.3d 896, 907 (Tex. App.—El Paso 2019, no pet.) (citing *In Interest of R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.)). "Evidence of a parent's drug use and his or her inability to modify drug-related conduct supports a finding that termination is in a child's best interest." *In Interest of A.M.Y.*, No. 04-15-00352-CV, 2015 WL 6163212, at *4 (Tex. App.—San Antonio Oct. 21, 2015, no pet.) (mem. op.) (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)).

S.T. has a long history of substance abuse, including during this case. She admitted to using drugs before A.H. was first removed in April of 2021. During the monitored return of A.H., S.T. relapsed. After A.H. was re-removed, S.T. again used drugs. While S.T. is currently making progress on her addiction and sober life, she has a pattern of relapsing once her children are returned. This pattern has recured twice in A.H.'s short life.

Therefore, S.T.'s recent history of substance abuse exposes A.H. to instability. A.H. was not yet three years old when she had already been removed from S.T.'s care twice. S.T.'s pattern of relapse and return to endangering behaviors opens A.H. to the dangers of instability now and in the future. Although S.T. is committed to sobriety and long-term recovery, she understands that relapse is possible and a part of the recovery process.

These factors also support the trial court's best-interest finding.

**(3) Parental abilities and available programs**

18

A parent's past neglect or inability to meet the child's physical or emotional needs may be considered when analyzing her parenting ability. *Interest of O.E.R.*, 573 S.W.3d at 907–08. The circumstances that led to the child's removal may be considered as part of the parent's past neglect or inability to meet the child's needs. *In re S.R.*, 452 S.W.3d at 368-69. Here, the endangering environment and conduct to which S.T. subjected A.H. has been discussed in detail above. We reemphasize, briefly, the circumstances that show S.T.'s past neglect and inability to meet A.H.'s needs.

Although she was less than three years old, A.H. had already been removed from S.T. twice due to drug use. In addition to S.T.'s relapses, she placed A.H. in the care of someone she suspected of drug use. Finally, S.T. herself placed drugs in the home with A.H. and the suspected drug user. Through this environment and conduct, S.T. endangered A.H. and failed to provide her stability. While S.T. has made improvements through this case, the evidence also showed her pattern of improving while her children are in DFPS custody and failing to maintain those improvements once the children are returned.

While S.T. completed all of the required parenting classes, there was evidence that she had completed parenting classes before A.H.'s first removal and between the first and second removal. Yet the cycle repeated.

These factors also support the trial court's best-interest finding.

### (4) Plans and stability for the child

S.T. testified that if A.H. was returned to her care, she planned to remain living in her mother's home. According to S.T., her mother and J.P. would serve as in-home support for her and A.H. Further, J.P. agreed to take care of A.H. while S.T. was at work. S.T. also believed she

could obtain babysitting help through Aliviane or DFPS. Again, S.T.'s plans for A.H. and her stability are contingent upon her breaking a cycle that she has not been able to break thus far.

Upon termination, Martinez testified that DFPS planned for A.H. to be adopted by her current foster home, where her sister also lives, and where she is bonded with a foster mother who has provided consistent care. Moreover, the foster family has already planned for A.H. to possibly attend the early Headstart program.

These factors support the trial court's best-interest finding.

Viewing the evidence in the light most favorable to the finding, the trial court could reasonably have formed a firm belief or conviction that the termination of S.T.'s parental rights was in A.H.'s best interest. Accordingly, we overrule S.T.'s fourth issue.

## D. Conservatorship

In her fifth and final issue, S.T. challenges the legal and factual sufficiency of the evidence supporting the trial court's appointment of DFPS as A.H.'s permanent managing conservator. However, conservatorship determinations are reviewed for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When parental rights are terminated, the parent is divested of all rights and duties to the child, and the trial court must appoint the child a managing conservator. TEX. FAM. CODE ANN. §§ 161.206(b) and 161.207(a).

As we have overruled S.T.'s challenges to the trial court's order terminating her parental rights, she no longer has legal rights or duties to A.H. *See* TEX. FAM. CODE ANN. § 161.207(a); *Interest of J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston (1st Dist.) 2018, pet. denied). Therefore, S.T. does not have standing to challenge the portion of the trial court's order appointing DFPS as A.H.'s permanent managing conservator. *See id.* (holding that a parent whose termination of parental rights was affirmed could not challenge a conservatorship determination).

20

Even assuming S.T. had standing to challenge the trial court's appointment of DFPS as A.H.'s permanent managing conservator, such an appointment is often the legal consequence of the termination in this case. *See Interest of J.D.G.*, 570 S.W.3d at 856. Moreover, Martinez testified that DFPS recommended that S.T.'s rights be terminated and A.H. be adopted by her current foster family. Accordingly, even if S.T. were able to challenge this appointment, we would determine that the trial court did not abuse its discretion in appointing DFPS as A.H.'s permanent managing conservator on best interest grounds. We overrule S.T.'s fifth issue.

## CONCLUSION

We affirm the trial court's order.

LISA J. SOTO, Justice

August 14, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.